# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------:

UNITED STATES OF AMERICA,          : Case No.:23-MAG-6928

                Plaintiff,    :

   -against-                       :

TERRENCE ALLEN,                    : New York, New York

            Defendant.   : October 30, 2023

--------------------------------:


TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE GARY STEIN

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:          UNITED STATES ATTORNEY'S OFFICE
                        SOUTHERN DISTRICT OF NEW YORK
                        BY:  Joseph H. Rosenberg, AUSA
                        One St. Andrew's Plaza
                        New York, New York 10007

For Defendant:          FEDERAL DEFENDERS OF NEW YORK
                        BY:  Sylvie J. Levine, Esq.
                        52 Duane Street, 10th Floor
                        New York, New York 10007




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.


AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                    THE DEPUTY CLERK:  In the matter of
 2     23-mag-6928; USA versus Terrence Allen.
 3                    Counsel, may you state your name for the
 4     record, starting with the government.
 5                    MR. ROSENBERG:  Good evening, Your Honor.
 6                    This is Joseph Rosenberg, on behalf of
 7     the United States.  With me at counsel table is my
 8     colleague from the U.S. Attorney's Office,
 9     Ms. Chelsea Chisholm, and Special Agent, from the
10     FBI, Alex Felicias.
11                    THE COURT:  Good evening to all of you.
12                    MS. LEVINE:  Good evening again.
13                    The Federal Defenders of New York by
14     Sylvie Levine, on behalf of Mr. Allen.
15                    THE COURT:  Good evening, Ms. Levine.
16                    May I have the time and date and time of
17     arrest?
18                    MR. ROSENBERG:  Yes, Your Honor.  The
19     defendant was arrested this morning, October 30th,
20     at approximately 7 a.m.
21                    THE COURT:  Okay.  Good evening, Mr.
22     Allen.
23                    THE DEFENDANT:  Good evening.
24                    THE COURT:  I am Magistrate Judge Stein.
25                    You are here because you've been arrested
```

1    on a criminal complaint.  The purpose of today's

2    proceeding is to advise you of certain rights that

3    you have, to inform you of the charges against you,

4    to determine whether counsel should be appointed for

5    you, and to decide under what conditions, if any,

6    you should be released pending trial.

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  I'm going to explain certain

9    constitutional rights that you have.

10             You have the right to remain silent.  You

11   are not required to make any statements.  Even if

12   you have already made statements to the authorities,

13   you need not make any further statements.  Any

14   statements that you do make could be used against

15   you.

16             You have the right to be released, either

17   conditionally or unconditionally pending trial,

18   unless I find that there are no conditions that

19   would reasonably ensure your presence at future

20   court appearances and the safety of the community.

21             If you are not a U.S. citizen -- and I

22   know that you are -- you have the right to request

23   that a consular officer from your country of origin

24   be notified of your arrest.  In some cases, a treaty

25   or other agreement may require the government to

1   give that notice whether you request it or not.  I

2   am required by law to tell you this, even if you are

3   a U.S. citizen and it doesn't apply to you.

4           You have the right to be represented by

5   an attorney during all court proceedings, including

6   this one, and during all questioning by the

7   authorities.  You also have the right to hire your

8   own attorney, but if you cannot afford to hire your

9   own attorney, you have the right to have an attorney

10  appointed for you, and I would do that today.

11          Is there an affidavit of financial

12  condition in this case?

13          MS. LEVINE:  Yes, Your Honor.

14          THE COURT:  Do we have that?  Oh, I have

15  it.

16          Mr. Allen, I have before me a financial

17  affidavit that I'm holding up that appears to bear

18  your signature under penalty of perjury.

19          Sir, is that, in fact, your signature on

20  the financial affidavit?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Please be aware that if

23  you've made any false statements in this affidavit,

24  you can be charged with perjury.

25          Do you understand that?

1                  THE DEFENDANT:  Yes.

2                  THE COURT:  Based on the statements

3     you've made in the financial affidavit, I am

4     approving your application and appointing Ms. Levine

5     to represent you.

6                  I also have before me the criminal

7     complaint containing the charges against you.  The

8     complaint charges you with one count of possession

9     of ammunition after a felony conviction in violation

10    of Title 18, United States Code, § 922(g)(1).

11                 Ms. Levine, have you received a copy of

12    the complaint and reviewed it with your client?

13                 MS. LEVINE:  Yes, Your Honor.

14                 THE COURT:  Thank you.

15                 Mr. Allen, you have the right to a

16    preliminary hearing.  At a preliminary hearing, the

17    government would have the burden of establishing

18    that there is probable cause to believe that the

19    crime with which you are being charged has been

20    committed, and that you are the person who committed

21    it.  You or your counsel would be entitled to cross

22    examine any witnesses and introduce evidence at that

23    hearing.

24                 If you are in custody, you have the right

25    to have the preliminary hearing held within 14 days

1    of today.  If you are not in custody, you have the

2    right to have the preliminary hearing held within 21

3    days.  However, a preliminary hearing will not be

4    held if before the date it is scheduled to take

5    place, you are indicted by a grand jury or an

6    information is filed against you by the government.

7              Do you understand that?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  I will set a date for the

10   preliminary hearing at the conclusion of these

11   proceedings.

12             Is there an agreement regarding Mr.

13   Allen's release or detention pending trial?

14             MR. ROSENBERG:  There is not, Your Honor.

15             THE COURT:  What is the government's

16   position?

17             MR. ROSENBERG:  The government seeks

18   detention on the grounds of both flight and

19   dangerousness, Your Honor.

20             THE COURT:  Okay.

21             And, Ms. Levine, I take it you oppose

22   that?

23             MS. LEVINE:  Correct.

24             THE COURT:  Okay.

25             And on what basis does the government

1    understand it is entitled to a detention hearing?

2              MR. ROSENBERG:  Your Honor, the

3    government is entitled to a detention hearing here

4    because the crime charged in the complaint, the

5    unlawful possession of ammunition by a felon is

6    categorically a crime of violence within the meaning

7    of the Bail Reform Act under Title 18, United States

8    Code, § 3142(f)(1)(A).

9              THE COURT:  *U.S. v. Watkins*?

10             MR. ROSENBERG:  *U.S. v. Watkins*.  Yes,

11   Your Honor.

12             THE COURT:  But this is not a presumption

13   case, correct?

14             MR. ROSENBERG:  This is not.

15             THE COURT:  Okay.

16             Mr. Allen?

17             THE DEFENDANT:  Yes.

18             THE COURT:  I am required under the law

19   to release you either with or without conditions

20   imposed, unless I determine that there are no

21   conditions that will reasonably assure your

22   appearance in court as required and the safety of

23   the community.  I mentioned that before.

24             In this case, the government has asked

25   that you be detained without bail, and the

1    government is entitled to make that request because

2    you have been charged with what is considered a

3    crime of violence under the relevant statute.  I,

4    therefore, must determine whether any condition or

5    combination of conditions of release will protect

6    the safety of the community and reasonably assure

7    your appearance at trial.

8            In making this determination, I'm

9    required to consider several factors, including the

10   nature and circumstances of the offense with which

11   you were charged, the weight of the evidence against

12   you, your history and characteristics, and the

13   nature and seriousness of the danger to any person

14   or the community that would be posed by your

15   release.

16           The government bears the burden here of

17   establishing either by clear and convincing evidence

18   that there are no conditions that can ensure the

19   safety of the community, or by establishing by a

20   preponderance of the evidence, that there are no

21   conditions that can ensure your appearance as

22   required.

23           So that's the framework, the legal

24   framework for this decision.

25           And I will now hear argument from

1    counsel, beginning with Mr. Rosenberg.

2              MR. ROSENBERG:  Thank you, Your Honor.

3              The government concurs with Pretrial

4    Services' recommendation of detention in this case.

5    This case concerns an individual who opened fire in

6    the courtyard of a New York City Housing Authority

7    complex in the Bronx at 8:28 p.m. on a Thursday

8    night when other people were around.  He didn't fire

9    just one shot or two.  He fired 13 out to his side,

10   not straight into the air, and then he calmly walked

11   back into the apartment building from where he came.

12   It's only lucky that no one was hurt or killed that

13   night.

14             The charged offense is a crime of

15   violence under the Bail Reform Act, as already

16   mentioned, and it involves a firearm.  And those are

17   factors to be considered under § 3142, and they

18   weigh in favor of detention.

19             Regarding the offense charged here,

20   Your Honor, I've already described it, and it's

21   described in detail in the complaint.  The defendant

22   fired 13 shots at approximately 8:28 p.m., not in

23   the middle of the night, as he casually strolled

24   through the courtyard of a NYCHA complex in the

25   Bronx.

1          THE COURT:  Do you have any

2    understanding, or is there any evidence as to what,

3    if anything, he was shooting at or why he was

4    shooting?

5          MR. ROSENBERG:  Not yet, Your Honor.

6          As laid out in the complaint, however,

7    the weight of the evidence against the defendant is

8    overwhelming.  The individual who committed the

9    September 21st shooting was caught on surveillance

10   camera doing the shooting, and 13 shell casings were

11   recovered.  And there's also overwhelming evidence

12   that we know the individual who committed the

13   shooting is the defendant here.  And those reasons

14   are laid out in detail in the complaint, Your Honor,

15   but I'm happy to go through them also briefly here.

16         Notably, as described in the complaint,

17   Terrence Allen was involved in two encounters with

18   the police subsequent to the September 21st shooting

19   that were unrelated -- or one was related.  One was

20   unrelated.  On September 28th, he was stopped by

21   police driving a car that appeared to have the same

22   characteristics as a car that the shooter from

23   September 21st had been in just before the shooting.

24   And body-worn camera footage from that incident

25   confirms that Terrence Allen was driving the car,

1    and was stopped and to whom the car was registered,

2    looks just like the clear images of the shooter in

3    the September 21st shooting captured by surveillance

4    camera.

5           Similarly, on October 10th, Terrence

6    Allen was arrested by the New York Police Department

7    officers based on having been charged in the state

8    with crimes also arising from the September 21st

9    shooting.  At the time, he was also driving the

10   Silver Mercedes-Benz that appeared in the -- with --

11   the car with the same characteristics appeared in

12   the September 21st shooting surveillance video, and

13   it was the same precise car as Mr. Allen was driving

14   on September 28th, same license plate, same VIN.

15           And there was also further evidence

16   linking Mr. Allen to the crime, including some found

17   this morning during the arrest of Mr. Allen.  One

18   feature, prominent feature, of the shooter on

19   September 21st was that he was wearing a distinctive

20   blue New York Yankees baseball cap with a red brim.

21   That hat was seen this morning in plain view as the

22   officers were arresting Mr. Allen in Long Island.

23           THE COURT:  When you say "that hat," you

24   mean a hat that appears similar to the one captured

25   in the video?

1              MR. ROSENBERG:  Yes, Your Honor.  It

2      appears very similar.  It shares the same

3      distinctive features.

4              In addition, the silver Mercedes that has

5      the same light, that is precisely the same car as

6      the October 10th and September 28th car was right

7      out in front of the place of arrest this morning.

8      And it appears -- I submit to the Court that it's

9      exactly the same car as the shooter used in the

10     21st -- September 21st shooting.

11             THE COURT:  I understand your point in

12     referencing these two other incidents is to

13     demonstrate what you have described as the

14     "overwhelming evidence" of Mr. Allen's guilt of the

15     charged offense, but was there anything about

16     those -- either of those two incidents that goes to

17     the issue of danger or risk of flight, either in

18     terms of resisting arrest or other things that were

19     found on his possession or whatever it is that

20     caused the officers to pull him over on

21     September 28th?

22             MR. ROSENBERG:  I don't submit those

23     facts for that purpose, Your Honor.  I'm simply

24     attempting to show the overwhelming evidence that

25     shows that Terrence Allen, the man who sits to my

1    right today, was the shooter on September 21st.

2            Talking about danger now.  Beyond the

3    offense conduct charged here, which, of course, is

4    very dangerous, Mr. Allen's criminal history shows

5    that he's a dangerous person.  This is not the first

6    time he's been involved with guns.  He's been

7    arrested for five prior felonies and convicted on

8    two.

9            In 2018, Mr. Allen was arrested in

10   possession of a loaded firearm and a large capacity

11   ammunition-feeding device.  He was not ultimately

12   convicted of those charges, and he pled to a lesser

13   offense in September 2022.  But in 2006, perhaps

14   most importantly, Mr. Allen was convicted after a

15   jury trial of a robbery in the first degree.  And in

16   that case, Mr. Allen displayed what appeared to be a

17   weapon during a forceful robbery.  Mr. Allen was

18   sentenced to an aggregate term of eight years

19   imprisonment, and he was released in September 2013.

20           Before that, Your Honor, in 1999, Mr.

21   Allen appears to have been arrested for, among other

22   things, criminal possession of a weapon in the

23   fourth degree.  I'll also note, you know,

24   Your Honor, that we have not yet recovered the

25   firearm used in this shooting, and presumably the

1    defendant, Mr. Allen, still has access to it, and he

2    has very recently shown that he's willing to use it.

3              I'll pause there, Your Honor, for any

4    questions regarding the government's proffer about

5    the defendant's dangerousness.

6              THE COURT:  So the two prior felony

7    convictions are the 2006 robbery conviction -- and

8    what's the second one?

9              MR. ROSENBERG:  That was not a

10   conviction, Your Honor.  I'm sorry if I misspoke.

11   He was arrested in 2018 for possession of a gun, and

12   he was eventually convicted of a -- of a lesser

13   offense in 2022 and sentenced to time served.

14             THE COURT:  So he has ...

15             MR. ROSENBERG:  Yeah.  The second -- he

16   has been convicted of two felonies, Your Honor.  The

17   second is a drug felony that I was -- I didn't

18   describe the facts of here, Your Honor.

19             THE COURT:  Okay.  When did that take

20   place?

21             MR. ROSENBERG:  That was in 2003.

22             THE COURT:  Okay.  I see.  Criminal sale

23   of a controlled substance in the fourth degree.

24   That one?

25             MR. ROSENBERG:  Yes.

```
 1                    THE COURT:  Okay.  And then I did want to
 2        ask you about this 2022 conviction because I was
 3        confused about that.  Pretrial Service report refers
 4        to a conviction upon a guilty plea; something called
 5        General Violation of Local Law.  I have no idea what
 6        that means.
 7                    But directly underneath that, it also
 8        reports on the same date the plea/verdict was
 9        vacated.  So can you help me understand what that
10        was about?
11                    MR. ROSENBERG:  I'm not sure I understand
12        further than what's reported in the Pretrial
13        Services report, Your Honor.  I only know what I
14        know from there, which is what the defendant was
15        arrested for, and I'm not representing that he was
16        convicted of that -- those offenses.
17                    THE COURT:  But he was arrested for
18        criminal possession of weapons.
19                    MR. ROSENBERG:  He was arrested for being
20        in possession of a loaded firearm and a large
21        capacity ammunition-feeding device as well.
22                    THE COURT:  And do you know anything more
23        about that charge, other than what's laid out in
24        the --
25                    MR. ROSENBERG:  I do not.
```

 1              THE COURT:  Okay.  Going back to the

 2   shooting incident, which underlies the charge in

 3   this case -- and you've explained that it's unknown,

 4   at least at the present time, to the government what

 5   Mr. Allen may have been shooting at or why he may

 6   have been shooting.  But I assume you have some

 7   understanding of where the bullets went.  Did they

 8   go into a wall, a building, tree?

 9              MR. ROSENBERG:  Your Honor, I don't know.

10   I know that the shell casings were recovered at the

11   scene of the shooting, in the courtyard of the NYCHA

12   housing complex.  No bullets were recovered, and

13   there was a canvas done in local hospitals for

14   victims and things like that, and none were found.

15              THE COURT:  But where did the bullets go?

16   You don't have any understanding of that?

17              MR. ROSENBERG:  Not currently, Your

18   Honor.

19              THE COURT:  And you say there were people

20   around.  Could you elaborate on that?

21              MR. ROSENBERG:  Yes, Your Honor.

22              For instance, surveillance cameras --

23   literally, at the time of the shooting, you can

24   see -- and there's actually a photo in the

25   complaint, if you have in front of you, Your Honor.

```
 1                    THE COURT:  Page 5?
 2                    MR. ROSENBERG:  That is image 12.
 3                    THE COURT:  Great.
 4                    MR. ROSENBERG:  There's a -- what
 5     appears to be a --
 6                    THE COURT:  Page 6.
 7                    MR. ROSENBERG:  Page 6, image 12.
 8                    The shooter, who the government says is
 9     Mr. Allen, is circled in yellow.  There's a muzzle
10     flash going off as he's shooting the gun on the
11     lower left-hand corner of the image, which,
12     probably, the government should have highlighted
13     with a different-color circle, is an individual
14     about 10 yards away from Mr. Allen.
15                    THE COURT:  Were there any other people
16     in that photo?
17                    MR. ROSENBERG:  What we know, Your
18     Honor -- not in that photo.  But what we know, Your
19     Honor, is that body worn camera footage from
20     officers who responded to the scene minutes later
21     show that there are other people around and they're
22     talking to other people.  So there are people
23     around.
24                    THE COURT:  Well, the individual in the
25     photo is, you know, diametrically opposite the
```

```
 1    direction in which the shooter is shooting.  And I
 2    don't want to make light of any shooting incident
 3    where people are in the vicinity, but clearly, that
 4    individual doesn't seem to be in a risk.
 5              MR. ROSENBERG:  The government is
 6    certainly not saying this individual is the target
 7    of this shooting.  But, again, Your Honor, I want to
 8    emphasize, it's dangerous to shoot 10 meters away
 9    from anyone, even if you're shooting in the opposite
10    direction.  That's the government's view.
11              THE COURT:  Yeah.  And I realize this is,
12    you know, New York City, not the cornfields of Iowa,
13    but you really don't know what was in the vicinity
14    of -- in the direction of what he -- where he was
15    shooting?
16              MR. ROSENBERG:  Not currently, Your
17    Honor.
18              THE COURT:  How can that be?
19              MR. ROSENBERG:  Well, we're certainly
20    going to investigate further and -- but we don't
21    currently -- like, we don't know that yet, Your
22    Honor.
23              THE COURT:  Okay.  And there is a
24    state -- pending state charge based on the shooting
25    against Mr. Allen?
```

1          MR. ROSENBERG:  Yes.  Yes, Your Honor.

2     The next court -- Mr. Allen has been indicted.  The

3     next court date is November 8th in that case.

4          THE COURT:  And what happened?  Is there

5     going to be bail in that case?

6          MR. ROSENBERG:  Mr. Allen -- there were

7     bail conditions that were set.  Mr. Allen wasn't

8     able to -- my understanding -- was not able to meet

9     them for some time, so he was at Rikers for about

10    ten days.  Then he posted bail, and has been out

11    since about -- approximately October 20th.

12         And I'll just note, Your Honor, on that,

13    as came up in the violation preliminary hearing you

14    were doing before, the -- as the government

15    understands it, the standard for setting bail in the

16    state of New York is different materially than the

17    question before this Court, Your Honor.

18         And, pointedly, what I mean by that is

19    that the primary focus of the New York Criminal

20    Court's bail determination is risk of flight and

21    probability of return to court, rather than also

22    explicitly taking into account dangerousness,

23    although the defendant's criminal history -- the

24    statutory cite, Your Honor, is New York Criminal

25    Procedure Law, § 510.10.

1          And although some of the factors to be

2    considered in making a determination about whether

3    the defendant will return to court do -- can be seen

4    to relate to the defendant's, what you might

5    colloquially refer to as "dangerousness," it's not

6    the explicit focus of the Court's inquiry.  That's

7    the government's understanding, Your Honor.

8          THE COURT:  You can move on to risk of

9    flight.

10          MR. ROSENBERG:  Thank you, Your Honor.

11          The government also respectfully submits

12    that a preponderance of the evidence shows the

13    defendant poses a risk of flight.  This is -- this

14    case represents the first time Mr. Allen is facing

15    federal charges, and he faces a lengthy sentence, up

16    to the statutory maximum of 15 years imprisonment.

17    As already described, the weight of the evidence

18    against him here is overwhelming.  The defendant

19    also has a history, although the history is somewhat

20    in the past, of flight and non-compliance with

21    supervision.

22          So I'm particularly talking here about

23    the experience, in Mr. Allen's case, that began in

24    March 2003 in which he was arrested on a drug-sale

25    offense in March of 2003.  He was indicted two

1    months later.  And two weeks after that, a warrant

2    was issued for his arrest, and he didn't appear

3    following that for a month -- approximately a month.

4              THE COURT:  He was 20 years old at the

5    time?

6              MR. ROSENBERG:  Yes.  I believe that's

7    right, Your Honor.  21 -- 20.

8              In July of 2003, he was convicted by

9    guilty plea.  And in June of 2004, the following

10   year, he was sentenced to a term of probation of

11   five years.  In October 2004 --

12             THE COURT:  I'm sorry.  I'm not on the

13   same page as you.

14             MR. ROSENBERG:  Okay.

15             THE COURT:  What are you referring to

16   now?

17             MR. ROSENBERG:  Sorry, Your Honor.  I

18   missed that.

19             THE COURT:  Can you point me to what page

20   in the Pretrial Services report you're on.

21             MR. ROSENBERG:  Yes, Your Honor.  8 --

22   oh, it's on his -- I'm looking at his RAP sheet

23   right now.

24             THE COURT:  Oh.

25             MR. ROSENBERG:  Let me move to the

1    Pretrial Services.

2                    It's page 5, Your Honor.

3                    THE COURT:  Okay.

4                    MR. ROSENBERG:  So it says here in

5    October of 2004, which was four months after he was

6    sentenced to a term of probation -- and we know that

7    from his RAP sheet, Your Honor.

8                    On October 21, 2004, a bench warrant was

9    issued for the defendant's arrest, and he was

10   missing following that for two weeks, until

11   November 5, 2004, when the bench warrant was

12   vacated.

13                   In November he was found, and his

14   probation was revoked at that time, and he was

15   resentenced to a term of one to three years for,

16   again, it appears, selling drugs.

17                   In July of 2005 he was paroled.  And in

18   October 2005 -- so that's three months later -- at

19   the bottom of page 5, Your Honor, he was discharged

20   from parole for violating parole.  That's the first

21   line bolded on page 6 of the Pretrial Services

22   report.  And it appears at the bottom of the page

23   that he may have violated parole a second time.

24                   Furthermore, Your Honor, in the

25   defendant's criminal history, the government would

1   point to also an old, but still pertinent,

2   conviction for resisting arrest from 2001.  That's

3   on page 5 of the Pretrial Services report.  And his

4   RAP sheet indicates that Mr. Allen used -- has used

5   an alias in the past.  And, in fact, his conviction

6   for -- his conviction for robbery in 2006, you can

7   see on page 6 of the Pretrial Services report, Your

8   Honor, there is an italicized line in the middle of

9   the page that said, "Arrested under the following

10   name:  Tony Green."

11             THE COURT:  Can I see that --

12             MR. ROSENBERG:  In some -- Your Honor,

13   there are no conditions in the government's view,

14   that can assure the defendant's appearance and, most

15   importantly, that can assure the safety of the

16   community.  And the defendant should be detained

17   pending trial for those reasons.

18             THE COURT:  Thank you, Mr. Rosenberg.

19             MR. ROSENBERG:  Thank you.

20             THE COURT:  Ms. Levine?

21             MS. LEVINE:  Thank you, Your Honor.

22             I want to start by talking about the

23   timeline of this offense.  The alleged shooting took

24   place on September 21st of 2023.  Seven days later,

25   on September 28th of 2023, Mr. Allen is arrested in

1    a car stop.  He's -- it's for tinted windows or

2    something of the like, and he's released.  And the

3    government kept investigating.

4             And then on October the 5th, again, for a

5    traffic-related offense, he's pulled over, and

6    again, he's released, and the government keeps

7    investigating.  And then on October the 10th, he

8    gets arrested for this case, for this shooting.

9    He's put in handcuffs, he's read his rights, he's

10   brought to the precinct, and he goes to Bronx

11   Criminal Court, where he's arraigned on these exact

12   charges.  Bail is --

13            THE COURT:  Not these exact charges.

14            MS. LEVINE:  The -- for this shooting.

15   For this precise case.

16            THE COURT:  He's not charged with the

17   shooting in this case.

18            MS. LEVINE:  For the actions that were

19   allegedly undertaken in the Melrose Houses in which

20   a gun was discharged on September 21st of 2023.

21            And, Your Honor, to the extent these

22   cases are overlapping, it's absolutely my experience

23   that the state case is almost always dismissed when

24   the case is made federal or trigger locked, or

25   whatever the word we use for it is.  But I don't

1   expect him to be facing charges in both

2   jurisdictions.  I think the feds have now taken this

3   case, and now he's here.

4           But be that as it may, he gets arrested

5   on October the 10th.  He gets charged in connection

6   with the shooting at the Melrose Houses on

7   September 21st of 2021 -- 2023, and bail is set in

8   the amount of 50,000 -- in the amount of a $50,000

9   bond.

10          The government is correct, it takes his

11  family about a week and a half to put together the

12  money that's necessary to go to a bail bondsman and

13  pay a portion of that.  Two people had to sign for

14  Mr. Allen with the bail bondsman in the state, and

15  he was ultimately released on October the 20th of

16  2023, so that was ten days ago.

17          This morning -- and when he was -- sorry.

18          Then on October the 10th, when he's

19  arrested, they ask for his biographical information,

20  his pedigree information.  He gives it to them, and

21  he gives them the address where he's been living.

22  It was at that address where he was this morning

23  when the feds -- when the marshals went and picked

24  him up because the case had been federalized.

25          And I say all of this to say that every

1    single piece of that timeline weighs against any

2    risk of flight.  Mr. Allen was exactly in the

3    location that he had provided to the state court for

4    where he would be, the address he provided to the

5    Bronx bail bondsman.  He was exactly where he said

6    he would be.  And going back before the arrest, all

7    those small encounters with the police, if somebody

8    wants to flee, they flee.  To stay in the vicinity,

9    to stay in a place where he could easily be arrested

10   six weeks later indicates that he's not going

11   anywhere.

12            And, Your Honor --

13            THE COURT:  Weren't those encounters

14   before he was arrested on the state case --

15            MS. LEVINE:  They -- yes.  But he was

16   arrested -- right.  But to the -- sorry.

17            I guess what I'm trying to say is, he's

18   been around since September 28th until now for more

19   than a month.  We know exactly where he is.  He's

20   here in the Southern District of New York.  He's

21   had --

22            THE COURT:  Hasn't he been here all his

23   life?

24            MS. LEVINE:  Well, that -- that's exactly

25   what I was going to say, which is --

1          THE COURT:  I'm guessing that's not an

2     argument for you, but it's ...

3          MS. LEVINE:  It's my -- well, it's my

4     next argument.

5          No, but I think that for people who --

6     if, in fact, he is the person who did this shooting,

7     the behavior subsequent to that, if it was covert,

8     if he was not driving his car, if he was not in the

9     district, if he was using aliases.  If he was --

10    there are lots of things people can do to -- if they

11    don't intend to be up front with law enforcement,

12    and he did none of those things.

13         And particularly, over the course of the

14    last ten days, he's been out on bail in the state,

15    having put his mother and a friend's livelihoods on

16    the line for a $50,000 bond.  And where was he?

17    Exactly at home, where he was supposed to be, this

18    morning when the marshals picked him up.  That is

19    extremely strong evidence that Mr. Allen is going to

20    follow the rules of bail and -- because he already

21    has.

22         THE COURT:  For ten days?

23         MS. LEVINE:  For the last ten days,

24    absolutely.

25         THE COURT:  Okay.

 1              MS. LEVINE:  And the -- in connection
 2     with his bail obligations in the state, one, he had
 3     to check in with the bail bondsman.  I understand
 4     the date for him to do that in -- was -- one of the
 5     check-ins was today.  As soon as he was picked up,
 6     he alerted his family members to call the bail
 7     bondsman.  He's in extremely close touch with them
 8     so that they know exactly what he is and isn't doing
 9     of his own volition.  And over the last ten days
10     since his arrest, Mr. Allen returned to the life
11     that he has had over the last ten years, and it's
12     those ten years I would like to now talk about.
13              Mr. Allen was released from state prison
14     on his last -- so his prior felony convictions are
15     from 2003 and 2006.  He gets out of prison in 2013.
16     Since 2013, he has had the same kind of job.  He's a
17     residential manager at various homeless shelters.
18     Right now, he has two jobs run by two nonprofits
19     that each have their own set of shelters in the
20     Eastern District of New York and Long Island.  And
21     he goes.  He works 40 hours a week for one company
22     and 20 hours a week for the other company, serving
23     as a residential manager.
24              THE COURT:  Give me those hours again.
25              MS. LEVINE:  It's 40 hours a week at one

1    company and 20 to 22 hours at the second company.

2              So he -- for the last ten days, he's been

3    back at work.  If he's released today, he can go

4    back to work tomorrow.  We spoke to his boss.  His

5    boss is actually the person he was living with in

6    Long Island.  He said, of course he can come back to

7    work tomorrow.  We stand ready to let him keep

8    working.  They've let him keep working for the last

9    ten days, and they hope that he continues to work

10   into the future.

11             THE COURT:  So they know about both the

12   state arrest and the new arrest, and that boss, at

13   least you are representing to me, said that he will

14   continue to employ Mr. Allen?

15             MS. LEVINE:  Precisely.  And --

16             THE COURT:  Is that the 40-hour a week

17   job or the 20- to 22-hour a week job?

18             MS. LEVINE:  He's the boss of both of

19   them?

20             Oh, he's the boss at both of them.  I

21   guess he's his supervisor at both companies.

22             Is that right?  Okay.

23             THE COURT:  Okay.

24             MR. ROSENBERG:  This is a man who sits

25   before you with incredibly strong ties to the

1    community in addition to his track record at work

2    for the last decade, a job he still has and can

3    return to, and the fact that he's lived in New York

4    his whole life.  He's never had a passport.  He's

5    never traveled.

6              He is married.  His wife is here in the

7    courtroom.  She's raising her arm for Your Honor's

8    identification.  She -- they haven't been living

9    together in the last few years.  Mr. Allen's been

10   living on Long Island, which is close to his jobs,

11   with his supervisor.  But upon his arrest today and

12   discussing, kind of, what federal bail would

13   require, they both want him to go live with her.

14             She lives here in the Southern District

15   of New York.  She lives within walking distance,

16   actually, of the courthouse.  And not only is she

17   happy to have him there, we had a very long -- we

18   explained to her that he may very well have to wear

19   an ankle monitor if he were released, that that was

20   going to be part of the package we propose to the

21   Court, that that ankle monitor would have to be set

22   up in her home, that Pretrial Services would have to

23   have an opportunity to, you know, check in on him

24   and follow all the rules.

25             She's also willing to co-sign.  She's a

1    financially responsible person.  She has a job, and

2    she's willing to co-sign for him.  Also willing to

3    co-sign for him, his mother, whom he speaks to every

4    day.  She also lives in the Southern District of New

5    York.  She also signed the state bond.  She's also a

6    financially responsible person.  And then we have a

7    third co-signer who's a friend, who also signed the

8    state bond, and is willing to, again, sign

9    Mr. Allen's bond here.

10           I should say that in addition to his mom,

11   his wife, his friends, his boss, his job, his -- he

12   has one child who lives in the Southern District of

13   New York.  He supports that child financially with

14   the money that he earns at this job.  And those are

15   robust connections to the community.  And we submit

16   that asking those people, the combination of people

17   I just mentioned, to sign a bond would be an

18   important part of a combination of conditions that

19   can be set here.

20           THE COURT:  His job or jobs, plural, are

21   both out in Long Island?

22           MS. LEVINE:  They are.

23           THE COURT:  Where in Long Island?

24           MS. LEVINE:  Huntsville and -- Union --

25   sorry.  I'm so sorry.  Huntsville is wrong.

 1    Hempstead and Uniondale.

 2              THE COURT:  And how does he get -- or

 3    more accurately, how would he get there if he were

 4    to live here in the Southern District of New York

 5    with his wife?

 6              MS. LEVINE:  I mean, Judge, he has a

 7    driver's license and a car, so that would be one

 8    way.  And also, there are trains that go to both of

 9    their locations -- both of those locations,

10    obviously.

11              And look, the -- there is no question

12    that the allegations in this case are serious.  I'm

13    not going to minimize them, but I -- it is incumbent

14    upon me, I think, to -- the government mentioned the

15    statutory maximum, which is, of course, 15 years.

16    The statutory minimum in this case, of course, is

17    zero.  There's absolutely no requirement,

18    necessarily, that he go to jail on this case.  We

19    have lots of clients -- I have lots of clients who

20    have been granted bail, robust bail packages, but

21    bail in these kinds of cases.  There is no

22    presumption of detention, which I've argued many

23    times in this court means there's a presumption of

24    release, that -- and, of course, the question is

25    not, are -- is there some danger, or is there some

1    risk of flight?  The question is, are there

2    conditions that can be overcome?  And so we submit

3    that the following bail package is appropriate in

4    this case.

5             We submit that -- a $50,000 personal

6    recognizance bond co-signed by three financially

7    responsible people.  We suggest that he be outfitted

8    with an electronic monitor.  We suggest that the

9    technology be left to the expertise of Pretrial

10   Services.  We -- the next condition would be that he

11   continue his employment, as we're confident that he

12   can.

13            And, of course, along with the other

14   standard obligations, which are equally important,

15   travel restrictions to the Southern and Eastern

16   District of New York, Pretrial supervision as

17   directed, no possession of a weapon, et cetera, et

18   cetera.

19            So, Your Honor, this is a robust bail

20   package.  It is appropriate for a person who was

21   already released on bail and was found at home in

22   the same location where he previously was, who now

23   has a place within walking distance of the

24   courthouse, where he can wear an ankle monitor with

25   his wife.  And the people in his life who have

1    already put themselves financially on the line for

2    him are willing to do it all over again.  And that

3    indicates to Your Honor that there are people in

4    this community who trust him.  Obviously, his

5    employer trusts him.  And for all of these reasons,

6    there are conditions that can be set here.

7              THE COURT:  You focus your argument on

8    risk of flight and ties to the community.  And,

9    frankly, despite Mr. Rosenberg's argument, I'm not

10   really persuaded that he's a serious risk of flight.

11   But I would like you to address the danger issue,

12   which I think is the real issue in this case.

13             MS. LEVINE:  Sure.  So the -- I think, in

14   my opinion, the sole risk of danger articulated in

15   the record that I have before me is the instant

16   offense conduct.  And I'm not going to minimize --

17             THE COURT:  Well, there is a criminal

18   history --

19             MS. LEVINE:  So I'm going to --

20             THE COURT:  -- that includes firearms.

21             MS. LEVINE:  I'm going to get to that in

22   just a second.  But first and foremost is -- of

23   course, are the allegations here.  I do think that

24   if the Court were to put him on an ankle monitor and

25   require, say, home detention with it, which would

1    mean he's home in lower Manhattan with his wife, or

2    in the Eastern District of New York on Long Island,

3    the Court could prohibit him from going to the

4    Melrose Houses in its entirety.  You could ban the

5    ZIP code.  You could probably ban the borough, I

6    think, if you wanted.

7              So to the extent that there is some kind

8    of -- whatever led to the shooting as alleged in the

9    complaint, we could remove him from that address,

10   area, people, vicinity entirely with the conditions.

11   So I think that is one important way that the bail

12   conditions can combat the potential risk of

13   flight -- excuse me.  I'm so sorry -- the

14   dangerousness that has arisen from the allegations

15   in this case.

16             With regard to his criminal history, you

17   know, I really worry when the government uses arrest

18   charges instead of convictions, like in the 2018

19   case, against somebody.  All we know about this case

20   from 2022 is that he allegedly pled guilty to

21   general violation of local law, misdemeanor.  And it

22   also says that that plea was vacated.  There is no

23   basis for the Court to conclude on that record that

24   he possessed a firearm or that he possessed a

25   firearm with a large ammunition device or whatever

1    the government said.

2              Arrest charges are just that.  They are

3    arrest charges.  They don't even have to sustain a

4    finding of probable cause.  And so the -- to use

5    that against Mr. Allen in this context I think is --

6    should not be given weight by the Court.

7              Looking further back to 2003 and 2006,

8    you are absolutely correct, that the 2006 case is a

9    serious one.  And it looks like it was -- it's hard

10   to -- it looks like, yeah, he was convicted of what

11   is a violent felony in the Bronx after trial, and

12   for that crime, he went to prison.  He went to

13   prison for, it looks like, up to eight years.  He

14   was released on parole in 2013 and then was

15   successfully discharged from parole in 2019.

16             So I'm not saying those things don't

17   matter.  I'm saying that there are conditions that

18   can overcome them.  Keep him away from this location

19   entirely, monitored by an ankle bracelet.  That's

20   one huge way to overcome the potential danger here.

21   And given all the good things that have been going

22   on in his life and given all of the pro-social

23   connections he has -- and, you know, one other

24   thing.

25             You know, we talk about bonds as if they

1    only relate -- or co-signers primarily as they

2    relate to risk of flight, but I would suggest to you

3    that they also relate to the safety of the community

4    because Mr. Allen is tying his mother's financial

5    future, his wife's financial future to his behavior.

6    And that has to be -- there has to be some kind of

7    behavior -- modification pressure there, right?

8            That's one of the reasons we ask for

9    co-signers, is so that the people in your life say,

10   I'm on the line for this too.  You have to stay out

11   of trouble, and you have to follow the rules, and

12   that includes not committing any acts of violence.

13           So, obviously, I'm happy to answer any

14   questions, but I think that that -- those conditions

15   altogether -- for someone who has a job and has

16   these ties to the community and financially supports

17   a child, bail is appropriate under 3142.

18           THE COURT:  And without intending to

19   trample upon the Fifth Amendment, can -- is there

20   anything you can tell me that you would like to tell

21   me about the circumstances of the shooting?

22           MS. LEVINE:  I have no information to

23   share at this time, other than, like I said, I

24   think, certainly, our ankle-bracelet technology can

25   keep him fully away from there.

```
 1                    THE COURT:  Mr. Rosenberg?
 2                    MR. ROSENBERG:  If the government may,
 3      Your Honor, so I'll start -- I understand that
 4      Your Honor is inclined to disagree with our risk of
 5      flight argument.  I'd just like to say one more
 6      thing about that.
 7                    Ms. Levine discussed that he was exactly
 8      where he was supposed to be.  He's done -- he's been
 9      around.  He's been around in the last ten days.  In
10      the -- from the government's --
11                    THE COURT:  I wasn't paying any attention
12      about it.  I mean --
13                    MR. ROSENBERG:  Okay.
14                    THE COURT:  But more compelling to me are
15      his community ties.  He's lived here all his life.
16      He has a wife, admittedly somewhat estranged,
17      apparently, but willing to take him back.  He has a
18      job, a significant job.  He has no real recent
19      history of -- in my view, of failure to appear.
20                    So those are the things that make me
21      think that the risk of flight argument is not a
22      strong one.  But no, the fact that he hasn't
23      violated his state bail over the last ten days is
24      not one of the factors in my analysis.
25                    MR. ROSENBERG:  Understood, Your Honor.
```

1          And I won't belabor the point, but I
2   wasn't intending to make that point.  What I was
3   intending to say is that the defendant has not been
4   at his Long Island address since he was released.
5   The government had trouble finding him, in fact.
6   This shooting occurred in the Bronx at a location
7   that it's unclear what the defendant's connection
8   with is, okay.

9          And he also -- before last night, the
10  government's cell-site location information in real
11  time indicated that for days, the defendant had been
12  at his wife's house -- apartment near the
13  Williamsburg Bridge.  So he was there until last
14  night.  And agents this morning had to go to Long
15  Island to arrest him, even though that's not where
16  they were expecting him to be this morning.

17         So there are also multiple addresses
18  listed on the defendant's RAP sheet that he's
19  associated with, including the one on Long Island,
20  to be sure, Your Honor, not including -- and there
21  are two others that are listed.  Those do not
22  include the one where his wife lives, and they do
23  not include the one in the Bronx where the shooting
24  happened, where he was going in and out of before
25  and after the shooting.  And so there's complication

1    here, Your Honor.  It's not as simple as the

2    defendant made it out to be.

3              THE COURT:  And the address he had given

4    to the state court in connection with the state

5    case, does anybody know what that is?

6              MR. ROSENBERG:  I don't, Your Honor.

7              MS. LEVINE:  Sorry.  It's on page 2 of

8    his RAP sheet.  It is the Long Island address where

9    he was arrested this morning.

10             THE COURT:  I'm sorry.  I'm confused.  He

11   was arrested at the Long Island address?

12             MR. ROSENBERG:  He was arrested at the

13   Long Island address.

14             THE COURT:  I thought you had said --

15             MS. LEVINE:  Yeah.

16             MR. ROSENBERG:  No.  She --

17             MS. LEVINE:  Sorry.

18             THE COURT:  Ms. Levine --

19             MR. ROSENBERG:  Sorry.  Can I try to

20   clear this up, Your Honor?

21             THE COURT:  Yes.

22             MR. ROSENBERG:  Until last night,

23   cell-site location information that the government

24   has indicated that the defendant was not in Long

25   Island.  He went there last night.  He was at his

1    wife's address or in the vicinity of his wife's

2    address in downtown Manhattan for days before that.

3    So it wasn't as though he was -- he'd been there the

4    whole time since he was released.

5              THE COURT:  Would that be a violation

6    of --

7              MR. ROSENBERG:  No, Your Honor.  No.

8              THE COURT:  -- his conditions of release

9    or whatever?

10             MS. LEVINE:  No.

11             MR. ROSENBERG:  But he is -- the

12   government is simply making the point, and won't

13   belabor the point any further, that the defendant is

14   not static and not -- he's been moving around, and

15   we don't understand exactly all the places that he's

16   gone.

17             I'll just --

18             THE COURT:  Why isn't an ankle bracelet

19   enough here?

20             MR. ROSENBERG:  So -- okay.  So, Your

21   Honor, the government really wants to hit, once

22   again, the point of the dangerousness of this

23   conduct, in addition to the defendant's criminal

24   history, that -- this conduct in particular.

25             The photograph that we already discussed,

1    Your Honor -- I understand Your Honor's point that

2    this was not done in the middle of Times Square and

3    there's a photo with someone else in it, but he's

4    shooting the other way.  This is still incredibly

5    dangerous, in the government's view.

6              For instance, as you noted, he's shooting

7    in the diametrically opposite way.  Suppose he was

8    shooting at someone.  The other person would shoot

9    right back at him and the woman -- the individual is

10   right behind him.  It's lucky that that wasn't the

11   case.  An ankle bracelet would not have stopped this

12   shooting, or might not have stopped this shooting.

13   It's not clear to the government why those things

14   are necessarily related.  Even if you were coming

15   and going to and from work or home, you can still do

16   a shooting in the middle of a public courtyard.

17             And so, you know, we, again, join the

18   Pretrial Services recommendation, which they spell

19   out the reasons for on pages 7 and 8 of their

20   report, that there are no conditions or combination

21   of conditions that will reasonably assure the safety

22   of the community, primarily, but also, in the

23   government's view, the appearance of the defendant.

24             Thank you, Your Honor.

25             THE COURT:  Thank you.

1            I'd like to take a short break and mull

2     this one over a little bit and come back out and let

3     you know what my decision is.

4            (A recess was taken.)

5            THE COURT:  I think this is a close case,

6     but after considering the arguments of counsel and

7     Pretrial Services report and the criminal complaint

8     in this case, I'm going to order the defendant

9     detained.  I find there are no conditions that I can

10    impose that will reasonably assure the safety of the

11    community.

12            My ruling does not rest on risk of

13    flight.  I don't believe the government has met its

14    burden, even by a preponderance of the evidence to

15    show that Mr. Allen is a flight risk, given his

16    strong ties to the community.  But on the issue of

17    dangerousness, and even though the government has a

18    higher burden of showing a danger to the community

19    by clear and convincing evidence, as I weigh the

20    factors that I am required to look at, I do believe

21    they weigh in the government's favor.

22            Beginning with the nature and

23    circumstances of the offense -- and that's really

24    the most important factor in my mind -- you have a

25    situation where not only was Mr. Allen allegedly in

1    possession of ammunition, and, although not charged

2    with it, a firearm as a previously convicted felon,

3    but the allegation here is that he used that firearm

4    to shoot 13 rounds in a courtyard of an apartment

5    complex.

6             There is nothing before me to show that

7    people were -- people's lives were put in jeopardy

8    from that shooting incident in terms of any evidence

9    that there were people in the vicinity of where the

10   shots were fired or anything by way of a motive that

11   Mr. Allen, or whoever the shooter was, would have

12   had to hurt somebody.  But it is 13 shots in the

13   middle of a densely populated urban area.

14            And, frankly, if there was no motive for

15   that shooting, that doesn't make me feel more

16   comfortable from a dangerousness point of view.  It

17   may be a different type of danger, but it's still a

18   serious concern of danger to the community if you

19   have somebody shooting a weapon 13 times for no

20   reason.

21            The weight of the evidence does seem very

22   strong to me, based on the criminal complaint and as

23   described and summarized by counsel for the

24   government.  There's certainly no burden on the

25   defense at this point to persuade me that Mr. Allen

1    is not guilty of these charges.  But really, given

2    the record before me, that factor as well, the

3    weight of the evidence weighs strongly in favor of

4    the government.

5            In terms of Mr. Allen's history and

6    characteristics, I don't think that presents

7    overwhelming indicia of dangerousness, but it

8    certainly does present some.  There are several --

9    well, there is a conviction, for one thing, of a

10   robbery in which a firearm, or what appeared to be a

11   firearm, was brandished.  And there are additional

12   arrests involving weapons.  I wish the Court knew

13   more about them, in particular, the 2018 arrest.

14           But nevertheless, the fact that there

15   was, sort of, a pattern of Mr. Allen and his

16   involvement with firearms, which appears to be the

17   case from the record before me, weighs very heavily

18   when I consider the issue of danger to the

19   community.

20           And so I do believe, considering the

21   final factor, that the nature and seriousness of the

22   danger to the community is significant here because

23   of Mr. Allen's past history with weapons and, most

24   importantly, his most recent history with this

25   weapon and this shooting incident.

1            I have considered carefully Ms. Levine's

2    arguments and her proposed package, but I don't

3    believe those conditions would adequately protect

4    the safety of the community.  Even with an ankle

5    bracelet, Mr. Allen would be free to move around.

6    We don't know where the firearm is.  And, again,

7    given the nature of the incidents and the strength

8    of the evidence, the danger to the community seems

9    palpable to me.

10           I do appreciate the willingness of

11   members of the defendant's family and his wife's

12   appearance here today to support him, but because of

13   what I've described, I find that, even with a bond

14   co-signed by the three co-signers that Ms. Levine

15   proposed, I cannot reasonably assure the safety of

16   the community.  So that is my ruling.

17           MS. LEVINE:  Thank you, Your Honor.

18           THE COURT:  We need to set a date for the

19   preliminary hearing.

20           MS. LEVINE:  The 14th day, please.

21           THE COURT:  Preliminary hearing will be

22   set for Monday, November 13, 2023.

23           Anything further from the government?

24           MR. ROSENBERG:  No, Your Honor.  Thank

25   you.

                AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                    THE COURT:  Anything further from the
 2       defense?
 3                    MS. LEVINE:  Just one minute.
 4                    Your Honor, I'm just discussing a medical
 5       order, which I think I'm going to request from the
 6       Court.
 7                    THE COURT:  Yes, of course.
 8                    MS. LEVINE:  I'm just going to get the
 9       details about it.
10                    Your Honor, nothing further, other than a
11       medical order that I'll provide to your staff
12       shortly.
13                    THE COURT:  Thank you.  So I will sign
14       that.
15                    MS. LEVINE:  Thank you very much.
16                    THE COURT:  Are we adjourned?
17                    Thank you, all.  Have a good night.
18                    MR. ROSENBERG:  Thank you.
19
20                                        OOo
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3        I, Adrienne M. Mignano, certify that the

4    foregoing transcript of proceedings in the case of

5    USA v. Terrence Allen; Docket Number: 23MAG6928 was

6    prepared using digital transcription software and is

7    a true and accurate record of the proceedings.

8

9

10   Signature    _Adrienne M. Mignano_

11                ADRIENNE M. MIGNANO, RPR

12

13   Date:       November 15, 2023

14

15

16

17

18

19

20

21

22

23

24

25