

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 28, 2024

<u>BY ECF</u>
The Honorable Denise L. Cote
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   ***United States v. Terrence Allen*, 23 Cr. 588 (DLC)**

Dear Judge Cote:

The Government respectfully submits this letter in advance of the sentencing of defendant Terrence Allen, scheduled for July 10, 2024, at 10:00 a.m.  Both Probation and the defense contend that a bottom-of-the-Guidelines sentence of 46 months' imprisonment is the appropriate sentence in this case.  Upon careful consideration, the Government largely agrees.  A sentence of imprisonment towards the bottom of the Guidelines range of 46 to 57 months' imprisonment would be sufficient but not greater than necessary to serve the purposes of sentencing.

## I.   Background and Offense Conduct

On Thursday, September 21, 2023, at approximately 8:28 p.m., Terrence Allen opened fire in the courtyard of the Melrose Houses, a New York City Housing Authority residential complex in the Bronx (the "Shooting").  (PSR ¶ 9.)  That time—8:28 p.m. on a school and work night—is a time when families inside the Melrose Houses might have been inside their apartments having dinner, doing homework, or watching TV.  Allen did not fire just one shot, or two.  He fired 13 shots.  And he fired those 13 shots out to his side, at a height that could have struck and killed someone.  After he was done shooting, Allen calmly tucked his still-unrecovered firearm back into his waistband and walked back into the apartment building from where he came.  (*Id.*)

The defense repeatedly emphasizes that, during the Shooting, "[t]here was no one in the line of fire, no one in the immediate vicinity, and no one was hurt."  (Def. Mem. at 1.)  It is true that no one was hurt.  That is very lucky.  Allen fired a gun at a height that could have killed someone *13 times* in the middle of a public courtyard at the Melrose Houses, which is surrounded by apartment buildings.  The danger that Allen posed to the community is made clear by **Image 1**, which is a diagram of the Melrose Houses available on its website.  *See* https://www.nyc.gov/assets/nycha/downloads/pdf/Melrose.pdf (last visited June 26, 2024).  The red oval represents where Allen was walking when he let fire.  The yellow arrow represents the approximate direction in which Allen was shooting.  As is clear from the diagram, at the time Allen

discharged his firearm, he fired in the general direction of the NYCHA apartment building located at 320 East 156th Street, which was approximately 300 feet away.



**Image 1**

There were innocent individuals present in the Melrose Courtyard before, during, and immediately after the Shooting. In connection with the November 16, 2023 letter it submitted in support of Allen's continued detention pending trial (Dkt. 8), the Government provided the Court with certain surveillance camera footage making that clear. *See* Ex. B, Dkt. 8-2 (showing between 8:25 p.m. and 8:35 p.m., as captured from a surveillance camera on 700 Morris Avenue) and Ex. C, Dkt. 8-3 (showing between 8:28:20 p.m. and 8:28:55 p.m., as captured from a surveillance camera on 305 East 153rd Street).[1]  As seen in that footage, multiple bystanders were in the immediate vicinity of the Shooting, before, during, and after the Shooting.

Exhibit B shows that, in the minutes before the Shooting, several individuals traversed the courtyard in the Melrose Houses, including a delivery person on a moped. And in the minutes after the Shooting—but before NYPD officers arrived at the scene—numerous other individuals walked by the very place where Allen committed the Shooting. One couple was holding hands. Another person was riding a bicycle. Another was walking her dog. And a person with three children—one of whom was riding a scooter and fell in the precise area in which NYPD officers later recovered 13 spent cartridge cases—travelled the same path Allen had when he committed the Shooting. Exhibit C captures the moment of the Shooting from a different angle. From that angle, at approximately 8:28:27 p.m., it is possible to see Allen shooting, while a bystander sits on

---

[1]     If the Court no longer has access to those exhibits, the Government will of course reproduce them upon request.

a bench just yards to Allen's left.  (*See also* PSR ¶ 9.)  Furthermore, body worn camera footage from NYPD officers makes clear that, at approximately 8:37 p.m. (*i.e.*, shortly after NYPD officers arrived at the scene), they spoke with a number of individuals present in the Melrose Playground, which is the green area on the right-hand side of **Image 1**.  In sum, the defendant's actions on September 21, 2023, put real people in incredible danger.

In its sentencing submission, the defense offers (for the first time) an explanation for why Allen fired those 13 shots.  Allen says that, when he exited the elevator inside 700 Morris Avenue, he "encountered a group of 5-6 young men" who "approached him," "claimed that his car had almost hit one of them on the street a few weeks earlier," and "held a gun to Mr. Allen's head and threatened his life."  (Def. Mem. at 6.)  According to Allen, he then "retrieved a gun" and "fired the gun repeatedly" in the courtyard of the Melrose Houses "to send a message that he would not let the young men in the building take advantage of him."  (*Id.*)  Of course, this narrative does not excuse Allen's incredibly dangerous conduct.  In fact, it emphasizes that Allen kept a loaded firearm and was prepared to use it when he felt slighted.

This offense is not the first time that Allen has been involved with violence and firearms.

In 2007, Allen was convicted of robbery in the first degree, in violation of N.Y. Penal Law § 160.15(4), and robbery in the third degree, in violation of N.Y. Penal Law § 160.05.  More specifically, on or about November 18, 2006, at approximately 2:30 a.m., near 321 West 125th Street in Manhattan, Allen and another individual robbed two victims of U.S. currency by gesturing to their waistbands in a manner that simulated the presence of a firearm.  After his arrest, Allen provided officers with a false name—Tony Green—and threatened numerous police officers, telling them that he would fight and kill specific officers.  For those crimes, Allen was sentenced to eight years' imprisonment.  Allen was paroled in 2013. (PSR ¶ 36.)

On or about July 25, 2018, Allen was arrested and charged with numerous firearms-related offenses, among them (1) criminal possession of a weapon (loaded firearm) in the second degree, in violation of New York Penal Law § 265.03, and (2) unlawful possession of a large capacity ammunition feeding device, in violation of New York Penal Law § 265.36.  These charges arose from a vehicle search that occurred after NYPD officers approached a Nissan Maxima parked near 12 West 130th Street in Manhattan.  Three people were in the car; Allen was sitting in the passenger seat.  The car was Allen's—he provided a bill of sale for the car that listed him as the owner and later confirmed in an oral statement that the car was his.  Officers smelled the odor of marijuana and ordered the three individuals out of the car.  When officers searched the car, they found near the foot of the front passenger seat, *i.e.*, where Allen had been sitting, a panel hiding a firearm and a magazine.  During a later inventory search, officers also found in the car's trunk an additional magazine with 21 bullets, along with a backpack that contained 47 bags of marijuana. (*Id.* ¶ 37.)  Ultimately, in 2022, Allen pleaded guilty only to a misdemeanor—Possession of Pistol or Revolver Ammunition Within New York City, in violation of N.Y.C. Admin. Code § 10-131(i)(3)—in satisfaction of those serious charges (the "2022 Conviction").  (*Id.*)  Allen was sentenced to time served.

## II.     Procedural History

On October 24, 2023, the defendant was charged by complaint with one count of possession of ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1), in connection with the Shooting.  (Dkt. 1.)  An arrest warrant issued for the defendant the same day.  (Dkt. 2.)  On October 30, 2023, federal authorities arrested Allen.  Later that day, Allen was presented and detained following a bail argument before Magistrate Judge Gary Stein.  (Dkt. 3.)

On November 13, 2023, a grand jury in this District returned an indictment charging the defendant with one count of possession of ammunition after a felony conviction, in violation of 18 U.S.C. § 922(g)(1).  (Dkt. 5.)  On November 20, 2023, the parties appeared before Your Honor for an arraignment, initial pretrial conference, and argument on the defendant's renewed bail application.  The Court denied the defendant's bail application and continued Allen's detention pending trial.

On March 19, 2024, the defendant appeared before the Court for a change of plea hearing.  (PSR ¶ 3.)  There, the Court accepted the defendant's guilty plea and scheduled sentencing for June 27, 2024, which was subsequently adjourned to July 10, 2024.  (Dkt. 19.)

## III.    The Applicable Guidelines Range

For the reasons set forth in the parties' plea agreement, and repeated by Probation (PSR ¶ 3), the Government believes that the defendant's adjusted offense level is 21 and that his Criminal History Category is III, resulting in a Guidelines range of 46 to 57 months' imprisonment.  The only discrepancy between the parties' Guidelines calculation in the plea agreement and Probation's Guidelines calculation in the PSR regards whether the 2022 Conviction counts for zero or one criminal history point—the parties agree that it counts for zero, while Probation contends that it counts for one (PSR ¶ 37).[2]  As the defense points out (Def. Mem. at 7 n.3), the resolution of this dispute is immaterial, because either way, Allen remains in Criminal History Category III, and so his Guidelines range is the same.

## IV.    Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans*, 406 F.3d 138, 142 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take

---

[2]     In the Government's view, the 2022 Conviction counts for zero criminal history points because the conviction was for a "local ordinance violation," *i.e.*, N.Y.C. Admin. Code § 10-131(i)(3), and the acts that Section 10-131(i)(3) criminalizes are not also violations of state criminal law.  *See* U.S.S.G. § 4A1.2(c)(2) & app. note 12(B); *see also* N.Y.C. Admin. Code § 10-131(i)(3) (making it "unlawful for any person not authorized to possess a pistol or revolver within the city of New York to possess pistol or revolver ammunition, provided that a dealer in rifles and shotguns may possess such ammunition").

them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for rehabilitation; the kinds of sentences available; the need to avoid unwarranted disparities in the sentences imposed on similarly situated defendants, and the sentencing range under the Guidelines.

## V.    A Sentence Towards the Bottom of the Guidelines Range Is Appropriate.

A sentence towards the bottom of the Guidelines range of 46 to 57 months' imprisonment is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.  The defendant's conduct was extremely serious, and he does not seem to have been deterred by either a lengthy prior prison sentence or by having been caught recently with a firearm and ammunition.  But the defendant also presents strong mitigating factors, including that he has proven he can hold a job; he appears genuinely remorseful; and he has a strong support system that will help him become a productive member of society upon his release.

A substantial sentence is necessary to reflect the seriousness of the defendant's conduct and to provide just punishment.  The defendant's crime—possession of ammunition after a felony conviction—is by its nature a serious offense.  *See United States v. Sapp*, No. 2 Cr. 1065 (NGG), 2007 WL 1232073, at *3 (E.D.N.Y. Apr. 26, 2007) ("Defendant's conduct was extremely serious. When a felon possesses a gun, the public is put at significant risk.  The fact that Congress has enacted a specific criminal statute that provides serious penalties for such conduct reflects this significant risk."); *cf. United States v. Brown*, 690 F. App'x 774, 775 (2d Cir. 2017) (explaining that "the crime of conviction, possession of a loaded firearm by a defendant convicted of numerous violent felonies, was particularly serious").  Here, the defendant did not merely possess ammunition.  He discharged a firearm *13 times* in the middle of a public courtyard in the Bronx. The defendant claims that he fired those shots to intimidate others. (Def. Mem. at 5.)  Much more than intimidating, though, the shots were incredibly dangerous.  Allen discharged the firearm to his side, at a height that could have struck and killed someone.  As discussed above, Allen fired towards an apartment building, and there were people around before, during, and immediately after he shot.  Although thankfully no one was injured or killed, that was merely lucky.  Allen's actions were incredibly dangerous.

A substantial sentence is also necessary to afford adequate deterrence and to protect the public from further crimes of the defendant.  Allen has engaged in violent conduct in the past, and he has possessed firearms and ammunition.  As described above, in 2007 Allen received an eight-year prison sentence for robbery in the first degree, which involved reaching inside a victim's pockets and stealing money, while simulating the presence of a firearm in his waistband.  (PSR ¶ 36.)  That conviction and lengthy sentence did not deter the defendant from engaging in the

conduct that resulted in the 2022 Conviction, in which the defendant was found inside his own car with two other people, and officers found a firearm and ammunition inside that car, near where Allen had been sitting. (PSR ¶ 37.) The defendant characterizes the 2022 Conviction as an "exception to the positive progress" that he made "from 2013 to 2023." (Def. Mem. at 4 n.1.) This "exception," though, is concerning. That is because in both 2018 (the 2022 Conviction) and 2023 (this case), Allen has possessed firearms and ammunition. Indeed, in this case, the defendant shot a gun. Accordingly, it seems that Allen's conduct is getting worse, not better. A significant sentence is necessary to deter him from committing further crimes with firearms.

Although difficult to square with the defendant's conduct here, the Government nevertheless agrees with the defense that there are important aspects of Allen's history and characteristics that weigh in favor of leniency and counsel a sentence towards the bottom of the Guidelines range. Those aspects of Allen's background are ably laid out in the defense's sentencing submission. More particularly, although Allen does not have much of a formal education, he has shown himself to be a reliable and hard-working employee, capable of holding down decent-paying jobs for years at a time. (PSR ¶¶ 75-77.) Allen's supervisor speaks highly of Allen's work and states that he plans to re-hire Allen upon his release. (Letter, Dkt. 24-7.) And Allen enjoys strong support from his family, his wife, and his in-laws. (*E.g.*, Letters, Dkt. 24-2, 24-3, 24-4, 24-5, 24-6.) In sum, in the Government's view, despite Allen's criminal record, Allen presents more reason for optimism than many defendants pleading guilty to similar crimes, and his background presents significant reason to hope that he will be a productive member of society upon his release.

[Remainder of page intentionally blank]

## VI.     Conclusion

For the foregoing reasons, the Government respectfully submits that a sentence towards the bottom of the Guidelines range of 46 to 57 months' imprisonment, to be followed by three years of supervised release, would appropriately account for the defendant's history and characteristics, reflect the seriousness of the defendant's conduct, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.[3]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     _____
Joseph H. Rosenberg
Assistant United States Attorney
(212) 637-2326

cc:     Sylvie Levine, Esq. (counsel for defendant) by ECF

---

[3] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same). Although the defense argues that the Court should not impose that portion of Probation's first proposed special condition authorizing the search of Allen's "computer, other electronic communication, data storage devices, cloud storage or media" (Def. Mem. at 15 n.4), the Government respectfully submits that it reasonably relates to the important interests of protecting the public and deterring recidivism, given Allen's history and characteristics. Allen has a history of possessing contraband, including narcotics and firearms/ammunition, and committing violent offenses. (*See* offense conduct in this case and PSR ¶¶ 35, 37.) In today's world, evidence of such offenses is commonly found on electronic devices, such as cellphones, and in the cloud. For example, the location data on a cellphone might help locate a defendant at the scene of a shooting; the images and videos stored on an electronic device or in the cloud might show the relevant narcotics, ammunition, or gun; and the chats backed up on an iCloud account, for example, might reveal where a defendant obtained particular contraband. In this case, where the defendant has possessed and fired a gun, the intrusion into the defendant's liberty imposed by this portion of the search special condition is justified by the need to quickly and efficiently identify a threat of recidivism and to protect the public if there is reasonable suspicion to believe that Allen has violated a term of his supervised release or committed further criminal acts.